THE PRESIDENT, DIRECTORS AND CO. OF THE MECHANICS' BANK *against* THE NEW-YORK AND NEW HAVEN RAILROAD COMPANY.

By the act creating a corporation its capital stock was limited to $3,000,000, and divided into shares of $100 each, transferable in such manner as the company should direct; the entire stock was taken, and certificates issued therefor to the owners; and the by-laws of the company prescribed that transfers of stock should be made on the transfer books of the company, and required the certificate of ownership to be surrendered prior to the making of such transfer and the issue of a new certificate. The company established a transfer agency, and appointed its president transfer agent, who was authorized and accustomed, on the transfer of stock on the books in his charge and the surrender of the certificate therefor, to execute and deliver to the transferee the usual certificate, stating that he was entitled to the number of shares of stock specified therein, transferable on the books of the company by him or his attorney on the surrender of the certificate; the agent fraudulently gave to one Kyle a certificate, in the usual form, for eighty-five shares of stock, when, in fact, the latter owned no stock, none stood on the books in his name, and no certificate for such stock had been surrendered; the plaintiffs, in good faith, and relying upon the certificate as regularly issued and valid, made a loan to Kyle, receiving from him the certificate, with an assignment of the stock and a power of attorney to transfer the same. In an action by the plaintiffs against the corporation for refusing to permit the stock represented by the certificate to be transferred on its books, or to pay its value; *Held*, that the certificate was void, and that the plaintiffs did not

thereby acquire a right, legal or equitable, to any stock; and *held*, further, that the corporation was not responsible to the plaintiffs for damages sustained by dealing upon the faith of the certificate.

Such a certificate does not partake of the character of negotiable instruments; and the *bona fide* assignee, with a power to transfer the stock, takes the certificate, subject to the equities which existed against his assignor.

Also, *held*, that on the facts of the case, the doctrine of *estoppel in pais* was not applicable.

When and under what circumstances a principal is bound by the acts and contracts of his agent, discussed by COMSTOCK, J.[1]

Mechanics' Bank *v.* New York and New Haven R. R. Co., 4 Duer, 480, affirmed.

ACTION commenced in the superior court of the city of New-York, in December, 1854.

The complaint, after stating that the plaintiffs were a banking corporation, having a place of business in the city of New-York, alleged that the defendant was incorporated by the laws of Connecticut, and recognized as a corporation by the laws of this state, and that a portion of its road was located within this state; that from a time shortly subsequent to its organization, the defendant had maintained an office and transfer agency in the city of New-York; and that from 1846 until his resignation, on or about the 3d of July, 1854, Robert Schuyler was a director and president of the board of directors of the defendant, and its transfer agent in the city of New-York, charged with the keeping of the transfer books and the issuing certificates of ownership of the defendant's stock at that place. The complaint further averred, that on the 13th of May, 1854, the plaintiffs loaned Alexander Kyle $12,000, in consideration of his executing to the plaintiffs his note for that amount and delivering to the plaintiffs with the note the securities therein mentioned, and that the note expresssed the agreement between the parties. The note made by Kyle was set out. It bore date the 13th of May, 1854, and by its terms Kyle promised to pay to F. W. Edmonds, cashier, or order, $12,000 with interest on demand; and the note

---

[1] See *New York and New Haven Railroad Co. v. Schuyler*, 34 N. Y. 30, for a final determination of the questions arising out of the Schuyler frauds.

stated that Kyle had deposited with the cashier, as collateral security, one hundred and ten shares Harlem preferred stock, and eighty-five shares New Haven Railroad stock, as per certificates, with authority to sell the same at public or private sale, at his option, on the non-performance of the promise expressed in the note. It was further stated, that Edmonds was the cashier and agent of the plaintiffs, and acted as such in the matter, and that the note belonged to them; that Kyle delivered to the plaintiffs with the note a certificate in the usual form for the one hundred and ten shares Halem Railroad Company stock, and a certificate for eighty-five shares of the capital stock of the defendant, signed by Robert Schuyler, who was then the transfer agent of the defendant, in the following form:

" NEW-YORK AND NEW HAVEN RAILROAD COMPANY.
*No.* 4574.
Capital $3,000,000. New-York Office. Shares $100 each.

Be it known, that Alexander Kyle, of New-York, is entitled to eighty-five (85) shares of the capital stock of the New-York and New Haven Railroad Company, transferable on the books of the company, at its office in the city of New-York, by the said Alexander Kyle or his attorney, on the surrender of this certificate.

New-York, April 20, 1854.

ROBERT SCHUYLER,
Transfer Agent."

The complaint also stated that Kyle executed, under seal, and delivered to the plaintiffs with the note and the above certificate, an instrument in the following words:

" Know all men by these presents, that I, Alexander Kyle, for value received, have bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer unto the President, Directors and Company of the

Mechanics' Bank, in the city of New-York, eighty-five shares in the capital stock of the New Haven Railroad Company, standing in my name on the books of said company, and transferable only at its office in the city of New-York. And I do hereby constitute and appoint F. W. Edmonds, cashier of said bank, my true and lawful attorney, irrevocable, for me and in my name and stead, but to their use, to sell, assign, transfer and set over all or any part of the said stock; and for that purpose to make and execute all necessary acts of assignment and transfer, and one or more persons to substitute with like full power, hereby ratifying and confirming all that my said attorney or his substitute or substitutes shall lawfully do by virtue hereof. In witness whereof, I hereunto set my hand and seal, the twenty-sixth day of April, one thousand eight hundred and fifty-four.

ALEX. KYLE." [L. S.]

It was averred that the aforesaid certificate was in the form of and conformed in every respect to the certificates for the defendant's stock, which were admitted to be genuine and which it had always been in the habit of using, and that the plaintiffs supposed it to be and received the same as a genuine and valid certificate for the stock therein mentioned. That the par value of the stock was one hundred dollars per share, and its market value at the date of the certificate was ninety-four per cent of the par value. That Kyle had neglected and refused to pay any part of the amount specified in his note, except $2000 paid by him on the 17th of June, which had been endorsed, and that he was insolvent. That the plaintiffs had presented the certificate and power of attorney at the transfer office of the defendant, and demanded leave to transfer the eighty-five shares of stock, but that such leave was refused, the defendant alleging that the certificate was issued without authority. and the stock therein mentioned spurious. That the plaintiffs

requested the defendant to pay the amount of the market value of eighty-five shares of its stock at the time of the loan to Kyle, which was refused.   That the New-York and Harlem Railroad Company refuses to permit a transfer of the one hundred and ten shares, represented in the other certificate received by the plaintiffs from Kyle.   In conclusion, the plaintiffs demanded judgment for the amount of the par value of the eighty-five shares of stock, with interest from the date of the loan to Kyle.

The answer stated that the defendant was incorporated by an act of the legislature of the State of Connecticut, passed in 1844, which was set out; that the defendant maintained a portion of its road and transacted business in the State of New-York, under an act of the legislature of that state (*Laws of* 1846, *p.* 231), which the defendant was authorized to accept by the State of Connecticut.   That the capital stock of the defendant consisted of $3,000,000 only, to which it had been increased in pursuance of the act of incorporation, and for which certificates had been issued and were held by the owners of the stock.   The second section of the act incorporating the defendant is as follows:

"That the capital stock of said company shall be two millions of dollars, with the privilege of increasing the same to three millions of dollars, and to be divided into shares of one hundred dollars each ; which shares shall be deemed personal property, and be transferred in such manner and at such places as the by-laws of said company shall direct."

The answer averred that by this act power was given to the directors of the company to make such by-laws, rules and regulations as they should deem needful and proper, touching the disposition and management of the stock and property of the defendant, the transfer of shares and the duties and conduct of its officers, and which should not be contrary to the charter or the laws of the state or United States.   The answer further alleged that neither the defendant, nor its directors or officers had power to increase the

capital stock, or reduce the par value of the shares. That immediately after the incorporation of the defendant, it adopted the following by-laws in relation to transfers of and certificates for its stock, which ever after continued in force, viz :

" The principal transfer office shall be in the city of New-Haven; but transfer agencies may be established in the cities of New-York and Boston, by resolution of the board of directors; and all transfers of stock at any office shall be made under and in compliance with such rules and regulations and by such instruments of assignment and transfer (which need not be under seal) as may from time to time be made, ordered and appointed by the board of directors. Certificates of stock shall be in such form and issued under such rules and regulations as the board of directors may from time to time appoint and direct; but when a certificate of stock has been issued to any stockholder, no second or duplicate certificate shall be issued, unless the same shall be lost or mislaid, and then only on special resolution of the board of directors, and the compliance with the rules and regulations, conditions and stipulations as to the renewal of certificates lost or mislaid, which may be adopted, imposed or required from time to time by the board of directors."

That the board of directors made the following rules and regulations as to the transfer of stock :

" 1. All transfers of stock at any of the offices of the company, shall be made in the transfer books of the office at which the stock proposed to be transferred shall stand to the credit of the party to make the transfer ;

" 2. In case a certificate of the stock to be transferred shall have been issued, the same must be surrendered prior to the transfer being made ;

" 3. In case any assessment or assessments are due and unpaid on the stock to be transferred, the same must be paid in full, with interest prior to the transfer being made :

"4. Transfers may be made by the stockholders, in person or by duly authorized attorney, by the execution of the instrument in writing, without seal, in the transfer books as above provided, of the following form and tenor:

"'NEW-YORK AND NEW HAVEN RAILROAD COMPANY.
No.      .

Capital, $                          Shares, $          each.
(New-York Office.)
For value received, I hereby assign and transfer unto                 all right, title and interest in
shares in the capital stock of the New-York and New Haven Railroad Company.
New-York,              , 18      .

"5. The execution of this instrument of assignment and transfer shall sell, assign and convey, from the grantor to the grantee, all the rights, privileges and appurtenances of the shares of stock transferred, and shall divest and discharge the grantor and his representatives from all liability thereafter for any and every assessment which may be at any subsequent date charged upon said shares and the holder thereof; unless the same shall have been again transferred to the said grantor;

"6. Powers of attorney for the transfer of stock may be in the usual form, but they must be under seal, and executed by the holder of the stock in his proper handwriting, or by one of the firm when the stock is in the name of a firm, in which case one seal as the seal of all the members of the firm will be deemed in compliance with this resolution."

It was admitted by the answer that Schuyler was, from the organization of the company to the 3d of July, 1854, its president, and also its transfer agent in the city of New-York, appointed in pursuance of its charter and by-laws; and that he was charged with keeping the transfer books and the making of certificates of stock, whenever any transfer of the stock should be made by a former owner, and a

new certificate be required by the transferee. But it was denied that he was charged with the issuing of, or that it was his duty to issue certificates of stock in any other manner or for any other purpose, or that he was charged with any other powers in relation thereto than those conferred by the charter and by-laws of the defendant. The answer further alleged that Schuyler, on or about the 20th of April, 1854, without any power or authority from the defendant or its board of directors, and without the surrender of any certificate of stock, and when there was none of the stock standing in his name, or in the name of any other person which he was authorized to transfer, and while all the stock was owned by other persons, and the certificates outstanding, falsely and fraudulently made the certificate set out in the complaint, and delivered it to Kyle, who was not entitled thereto, nor the owner of any such stock as was mentioned in the certificate; that Kyle, when he received the certificate, knew it was falsely and fraudulently issued, and that it did not represent any of the genuine stock of the company; that the same was not delivered to the plaintiffs by defendant, or for its use or benefit, nor by any person acting or professing to act for it or on its behalf; that nothing was ever received therefor by the defendant or by any one while professing to act for it or in its affairs; and that neither the defendant nor its board of directors authorized the delivery of the same to the plaintiffs, or had any knowledge thereof. It was admitted that the signature to the certificate was in the handwriting of Schuyler, and that it was in the form of the genuine certificates of stock which the defendant was accustomed to use. The answer alleged that Kyle was well known to the plaintiffs, as a young man of inconsiderable property and means, and that the plaintiffs, by inquiring at the defendant's office and examining its books, could have ascertained whether the certificate was genuine, and whether or not Kyle owned the shares of stock mentioned in it;

that the plaintiffs omitted to do so, and were guilty of culpable neglect.

The cause was tried before Justice Bosworth, without a jury, in February, 1855. He found the following facts:

That the defendant is incorporated under the acts of the legislature of the State of Connecticut, set forth in the defendant's answer, and is and was transacting business and operating its railroad under said acts and the act of the legislature of New-York recited therein.

That shortly after the organization of the defendant, and in the year 1846, it established the rules and regulations set out in its answer, which remained in force until after the 5th day of July, 1854; that under said rules and regulations it also established a transfer office in the city of New-York, and has ever since maintained the same there and also established and has since maintained two other transfer offices, one in New Haven and one in Boston; that in 1846, Robert Schuyler was a director in and president of the defendant's company, and its duly appointed transfer agent in the city of New-York, having charge of its office there and of its transfer books, and invested, as such transfer agent, with all the powers conferred by the charter and said rules and regulations on any transfer agent of the defendant; that Schuyler continued to be and to act as such director, president and transfer agent of the defendant until his resignation, on or about the 3d day of July, 1854.

That on or about the 13th day of May, 1854, the plaintiffs, a duly incorporated and legally organized banking institution, by and through F. W. Edmonds, who was their cashier, on the application of one Alexander Kyle, and without any communication previously or then had between the plaintiffs and the defendant or any of their officers or agents, loaned him the sum of $12,000, on his promissory note and collateral securities, being the same which are set out in the complaint; and that their execution and delivery were duly proved. The transfer and power of attorney by

Kyle, when delivered to the said Edmonds, were in blank, as to the name of the transferee and the attorney, and the same were subsequently inserted by the plaintiffs; that the plaintiffs made the loan in good faith, and had no reason, when they received the certificates, to suppose they were not genuine.

That the certificate for eighty-five shares of the defendant's stock was signed by Robert Schuyler, and was in the usual form of the certificates issued by the defendant to the holders and owners of the genuine and actual capital stock of the defendant. That the par value of the defendant's stock was $100 per share, and the market value thereof at the time of the loan was 94 per cent; on the 17th June, 1854, Kyle paid $2000 on account of the loan; and that the balance of the note and the interest is still due and unpaid to the plaintiffs. That the note was presented to Kyle for payment before the commencement of this action, and that he did not pay the same, and is insolvent. The plaintiffs, before the commencement of this action, applied to defendant to have the stock transferred, but the defendant refused to permit it. The plaintiffs, before the commencement of this action, also demanded payment or reimbursement from the defendant of the amount of the market value of eighty-five shares of its stock, but the defendant refused to pay the same or any part thereof. That the certificate of stock of the New-York and Harlem Railroad Company, mentioned in the said note, was illegally issued by the said Kyle, as secretary of the said company, and was an excess over and above the limited amount of the preferred stock of that company. That the capital stock of the defendant's company prior to January 1, 1850, and to the amount of $3,000,000, the amount limited by its charter, was all paid in and filled up, and certificates issued to *bona fide* owners thereof, who held them at the time said loan was made, and at the time the said certificate for eighty-five shares was issued. That the by-laws and rules of the

defendant in relation to the transfers of its stock, as set out in its answer, were duly passed immediately after the organization of the company, and were in force until after July 5th, 1854. That in 1849, the legislature of the State of Connecticut passed a law, which is still in force, in these words: " When any person or corporation shall usurp the exercise of any office, franchise or jurisdiction, the superior court shall have power to proceed by information, in the nature of *quo warranto*, to punish such person or corporation for such usurpation, according to the usage and principles of the common law; and, also, may permit an information in the nature of a *quo warranto* to be filed in the name of the attorney for the state, in the county where the cause of action arises, at the relation of any person desiring to prosecute the same, against any person usurping any corporate franchise or office; and may proceed therein and render judgment according to the course of the common law.". That Schuyler made and signed the certificate for eighty-five shares of the defendant's stock, and delivered it to Kyle to borrow money upon it for him, the said Schuyler; and that it did not represent any of the genuine stock of the defendant, being no part of the capital authorized by law. That the certificate was not issued for any lawful purpose whatever, but was a fraud on the part of Schuyler to raise money for his own private purposes. That in 1849, the legislature of the State of Connecticut passed an act entitled " An act in addition to an act relating to railroad companies," which is still in force, a part of which reads thus: " The shares in the capital stock of any railroad corporation shall be deemed personal estate; and they may be transferred by any conveyance in writing, either by the treasurer, in books to be kept in his office, or by the secretary, clerk or other officer duly authorized by the directors, in books to be kept at such other place as they may appoint; and no conveyance of any such shares shall be valid

against any othe: person than the grantors or their repre-sentatives, unless so registered."

That at the time of the loan by plaintiffs to Kyle he was secretary to the Harlem Railroad Company, and had been such for six years. Previous to being secretary, he had been for two or three years register, and signed the certificates of stock of that company with the secretary. That his salary at the time of the loan was $2000 per annum; that the loan was negotiated by him in his own name, but, in fact, for Schuyler, to whom Kyle paid the proceeds; but the plaintiffs did not know any one but Kyle in the transaction, and dealt only with him. The plaintiffs had previously made loans to him, both for himself and for Schuyler: that, at the time, he was a married man and had been a house-keeper for six years. He owned a house and lot in New-York, worth about $10,000, on which there was a mortgage of $4000. He was proprietor of a baggage express, for car-rying baggage from the Harlem railroad cars; his name was on the wagons, and his cards nailed up in the Harlem cars. He had been in the habit, for five or six years, of making loans from parties in Wall-street, on different stocks.

The justice, as matter of law, ruled and decided that the defendant was liable to the plaintiffs for the market value of eighty-five shares of the defendant's stock on the day it was required by the plaintiffs to reimburse and pay to them the amount of such value, with the interest thereon from that time; and he ordered judgment for such amount, being $8072.68, in favor of the plaintiffs against the defend-ant. The counsel for the defendant duly excepted to his decision. Judgment was perfected in favor of the plaintiffs, and affirmed by the superior court at a general term. The defendant appealed to this court.

*William Curtiss Noyes, Nicholas Hill, Jr.,* and *Geo. Wood,* for the appellants.

*E. S. Van Winkle* and *Daniel Lord,* for the respondents.

COMSTOCK, J. This is an action for damages founded on a certificate for eighty-five shares of stock in the defendant's corporation, issued to Alexander Kyle, upon the security of which the plaintiffs loaned to that person a sum of money; and the first inquiry naturally is, what was the force and effect of the certificate in his hands? The mode of presenting this inquiry most favorable to the plaintiffs is to consider it as free from the difficulty that there was no power in the corporation, its board of directors, or any of its agents, to create the shares of stock in question. Assuming that the corporation had stock at its own disposal, and that Robert Schuyler, as agent, had full power to sell it in market and issue the proper certificates therefor, it is clear that any person dealing with him in good faith, and paying value, would become entitled to all the rights and privileges of a stockholder, although the agent, by a secret fraud, intended the transaction to be for his own benefit, and used the funds which he received for his own private purposes. In such a case, the acts of the agent being such as the corporation was competent to perform, and strictly within the powers delegated to him, upon principles entirely familiar, the law would not permit third persons to suffer by a secret abuse of the trust.

But it is equally clear that no rights would be acquired by a party not dealing with the agent in good faith, and receiving a certificate of stock without paying any value therefor. To say that the original holder of such a certificate could not be admitted to a participation with the genuine and *bona fide* stockholders in the property, franchises and revenues of the corporation, is a proposition so plain that it needs only to be stated. Such was the situation of Alexander Kyle, the original holder of the certificate now in question. To what extent he was implicated in the frauds of Schuyler is not material. The certificate is admitted to have been issued fraudulently and he paid nothing for it. On this ground it was in his hands spurious and void;

and this is a conclusion which is reached without calling in question the power of the corporation to create the stock, or of Schuyler as agent to issue the proper evidence thereof to a purchaser in good faith.

The certificate in the hands of Kyle was also void for the additional reasons which will now be mentioned.

1. Schuyler, as the agent of the company, had no power to issue a certificate for shares of stock, except upon the conditions precedent of a transfer on the books by some previous owner, and the surrender of that owner's certificate. He was the transfer agent merely, and his powers were expressly limited to that department of the business of the corporation. He had no general certifying power, nor any power at all to certify, except as incidental to a transfer of stock by its owner to some one else, and as an incidental power it could only be exercised upon the conditions named.

2. Neither the board of directors by whom Schuyler was appointed agent, nor the whole body of the corporation had power to create the stock which the certificate issued to Kyle professed to represent; and if the stock itself could not be brought into existence by the whole power of the corporation, the certificate issued as the evidence of its existence and the right of the holder thereto was necessarily void. Upon the premises last stated the conclusion would be the same, even if Kyle had paid to the transfer agent the full value of the stock. He could purchase stock of any person who owned it, but he could not under any conditions obtain it from the corporation or its agents, because there was none to be had, and none could be created.

Thus far I do not understand that my conclusions differ essentially from the views of the counsel who have argued the cause for the plaintiffs; and if I was not mistaken in regard to the general scope of their argument, they conceded the further result, that the plaintiffs, holding the certificate by transfer from Kyle, have no rights as stockholders merely, for the particular reason that the stock cannot exist under

the charter; the essential ground of the action, in the view of the counsel, being the injury sustained by dealing upon the faith of the false representation of stock which the certificate contains. The opinions however of the judges in the court below are before us for examination, as well as those of eminent lawyers who have not appeared upon the argument, and I think it proper to refer to these opinions for the purpose of bringing into view all the theories upon which it has been supposed the plaintiffs' rights depend.

Mr. Justice Hoffman, in the opinion pronounced by him, holds that the certificate was not void as transcending the powers of the corporation in the creation of stock and issuing certificates therefor, or those delegated to Schuyler as the transfer agent. He, therefore, considers the obligation to be one which the defendant can perform and ought to perform, according to its terms. He admits that the effect of an over issue is to increase the number of shares, but not the actual capital; and, according to his view, the spurious certificates are to be made good by a reduction in the actual value of those that are genuine. He holds, therefore, that the defendant was bound to admit the plaintiffs as stockholders, and to register their shares on the books accordingly, and that this suit depends purely and simply on the non-performance of that duty after being requested to perform it. "Without a demand," he says, "and refusal to transfer, there would be no ground of action whatever."

Directly opposed to these views are those of Chief Justice Oakley. He holds the certificate utterly void, because it transcended the powers of the transfer agent, whose commission, he thinks, was special and not general; and if the action depended on the validity of the certificate, he says the following questions would have to be answered:

1. Whether the plaintiffs, as *bona fide* holders, could acquire any rights under it superior to those of Kyle, in whose hands it was void? And—

3 KERN.—39

2. Whether the plaintiffs can be considered as *bona fide* holders ? As to the last point, he inclines to think that the plaintiffs were bound to see that Schuyler, as agent, did not exceed his special powers, and, therefore, if they chose to deal in the stock without inquiring as to that fact, they took the certificate from Kyle at their peril. But the learned chief justice nevertheless holds the defendant liable, on the ground that the certificate was a false representation that Kyle held stock, when in truth he did not. He thinks that Schuyler, the agent, had an implied authority from the company to make such a representation ; an authority resulting from his constant habit of issuing certificates in the same form in the course of the regular business of the corporation. If, as he assumes, the certificate was void, tested simply by the authority given to the agent, and if, as he also assumes, the plaintiffs were bound to take notice of the want of authority, with deference, it appears to me, that they are affected by the same considerations when they change the grounds of complaint to misrepresentation and fraud. Can an agent's authority to misrepresent in the course of a dealing be inferred, when it is admitted he has no authority to enter into the dealing at all ?

Justices Bosworth and Slosson, if I do not misunderstand them, both admit that there was no power in the corporation to create the shares of stock which the certificate professes to represent, and that the instrument, considered as a real representation of stock, was void for that reason ; thus discarding the only ground upon which, in the opinion of one of their brethren, the action can be maintained. They nevertheless hold that the suit is not founded upon the notion of misrepresentation and fraud, thus as distinctly rejecting the theory of the other. They appear to me to have found a middle ground of liability, which is perhaps fairly expressed in the following language of Justice Bosworth : " The certificate," he says, " so far as any inferences can be drawn from its terms or appearance purports

to be and is as much the act of the defendant as any certi-
ficate that has been issued by the company representing
genuine stock. The plaintiffs took it, believing it to be
what it purports to be, and their action is based on the
theory that, as between them and the defendant, it is in
judgment of law the act of the defendant, and that the
defendant is estopped from asserting the contrary, so far
as the question of its liability for refusing to reimburse to
the plaintiffs the amount of their loan to the extent of the
value of the stock is concerned." And again he says : " The
action is based on the assumption, so far as the right to be
compensated in damages is concerned, that the company
has given an assurance that Kyle owned the stock which
the certificate represents stood to his credit on its books."
The reasoning by which these results are reached is, in sub-
stance, that the act of Schuyler in issuing the certificate
was within the apparent scope of his power, and therefore,
although the contract was void because it transcended all
the powers of the corporation, and was impossible to be
performed for the same reason, the defendant must, never-
theless, make it good in damages, upon an assurance that
it was valid, the assurance being a part of the contract
itself. I confess my own impression to be, that this reason-
ing is too refined. Admitting that the agent acted within
the scope of the power delegated to him by the board of
directors, I do not clearly see how certificates of stock,
which they themselves had no authority to issue, void in
their origin and under all conceivable circumstances, can
be made the basis of a liability ruinous to the genuine
stockholders, by turning the spurious instruments into a
promise or undertaking that the stock in fact existed.

The extreme difficulty which has been encountered, in
endeavoring to find a principle on which to rest the action,
may be further illustrated by reference to the professional
opinions which have been submitted to our examination.
In one of them — certainly entitled to the very highest

respect, the reasoning of which, I think, must have been in substance approved by Mr. Justice Hoffman — it is claimed that all the over issued certificates are valid, so far as question of corporate power is concerned; that the multiplication of shares did not increase the capital stock, but merely reduced the value of the shares; that the acts of Schuyler, in issuing such certificates, were done within the scope of his authority as agent; and as a conclusion from these premises, that all the holders in good faith, who had not already received new certificates in their own names, were entitled to receive them, and so to be admitted to all the rights and privileges of stockholders. In another of these opinions, distinguished by great acuteness and force of reasoning, the clear and emphatic concession is made, that the defendant has no corporate right to create a valid title to a single share of stock beyond the prescribed number; that the corporation being prohibited from issuing more than thirty thousand shares, was, by necessary consequence, forbidden to recognize as a part of its stock any share known to have been issued contrary to that prohibition, and consequently, that the directors might refuse to recognize all shares which could be clearly traced to an origin in the over issue. In respect to all such shares, it is claimed, however, that compensation in damages must be made by the corporation to the innocent holders who, by dealing in them, have suffered pecuniary loss. The issue of false certificates, it is insisted, was a failure of corporate duty, an act of negligence by the corporation, for which it is liable to the party injured. The company, it is also said, is bound by an estoppel in favor of the innocent shareholder, and must either recognize him as a stockholder or respond in damages as a wrong doer, for withholding his apparent right.

If those who assert that this action can be maintained had been able to agree upon a reason for that opinion, there would be fewer propositions to discuss than I shall feel obliged to examine.

I have already stated, in general terms, my own conclusion to be on the side of the invalidity of the so-called spurious shares, upon the ground of a want of corporate power to create them, and I will now give some further expression to my views on that question. By the charter of this railroad company, its capital stock was limited to $3,000,000, to be divided into shares of $100 each. It is admitted that the whole capital was subscribed and paid in, and that certificates of stock were issued, representing the thirty thousand shares actually subscribed and paid for. Now, if it is plain, as all concede, that the capital could not be increased beyond the $3,000,000, it seems to me equally plain that no more than thirty thousand shares could be created. Both are unalterably fixed by the charter; the capital by expressing the aggregate amount, and the number of shares by expressing the amount of each. The whole capital is divided into shares of $100 each, and the mathematical result is thirty thousand in all. Viewing the question, therefore, as one of abstract power, nothing appears to be wanting to a complete demonstration that additional shares could not be created. There is under the charter no more capacity to increase the nominal capital by multiplying the shares to an indefinite extent, than to increase the real capital by an actual subscription indefinitely beyond the specified limit.

But it is important to observe that the question has other relations than those which belong to it as one of simple capacity and power. The thirty thousand shares of original stock subscribed and paid for by the persons to whom the genuine certificates were issued, belonged to them in their individual right, and were as much their separate and individual property as any other possession which they could acquire. The entire capital was represented in the property and franchises of the corporation, and the owner of each share was entitled to a fixed and unalterable proportion of that capital. And from this it follows, that any attempts

to create a greater number of shares, by the issue of addi-
tional certificates, is not only a violation of the organic law
of the corporation, but a direct invasion of the contract
between it and each holder of its original stock. Now,
while it cannot be denied that the value of every share may
be reduced by misfortune or accident in the management of
the business of the corporation, or by the neglect and mis-
conduct of its agents acting within their acknowledged
powers, it is equally plain that this result cannot be effected
by a change in the fixed proportion which each share bears
to the aggregate number. It has been said that the limi-
tation of the capital and the number of shares was imposed
from considerations of public policy alone. This is not so.
Those who asked for the charter, and proposed to invest
their private capital in the enterprise which it contemplated,
required such a limitation for their own protection; and
every individual who subscribed and paid for shares of stock
must be deemed to have done so relying upon the charter
for the safety of his investment.

The conclusion to which I am brought upon this question
is not impeached by the consideration (if such is the fact)
that there are shares and certificates of stock, beyond the
original limit, which cannot be traced to an over-issue by
the fraudulent agent of the company. I know not how the
facts may be in this respect, nor is it material to the argu-
ment. The corporation may be compelled to respond to
the holders of certificates, amounting in the aggregate to
more than its capital, because it cannot distinguish those
which are spurious and those which are genuine. Thus the
number of shares to be recognized may be practically
increased, not for the reason that all over-issues are not void,
but because, in a given instance, the corporation cannot
show that the shares claimed are of that character. No
question of this kind arises in the case before us.

I have also stated, in general terms, as one of my conclu-
sions, that the certificate issued to Kyle was void in his

hands, upon the more special ground that the agent could not certify, except upon conditions which did not exist in respect to that transaction. I observe now, further, that a third person dealing with Kyle, and taking from him a transfer of the certificate, doubtless had reason to suppose that it had been duly issued. Whether a dealing with him, under that belief, created new rights against the corporation, I shall presently examine. But Kyle himself dealt directly with the agent of the company, and he knew the conditions had not arisen in which the power to certify depended. He knew this, because he surrendered no previous certificate, and had no transfer on the books or otherwise from any actual shareholder. Now, I do not understand it to be claimed on the part of the plaintiffs that the acts of the agent in issuing the spurious certificates were within any actual power which the corporation ever attempted to confer upon him, nor that all persons proposing to deal in the stock were not chargeable with a knowledge of the extent and limit of his authority. He was known to be a transfer agent merely of existing and genuine shares, and in that character his name was signed to the certificate in question and all others. What is claimed I understand to be precisely this: That the false certificates being regular on their face, and the same in form as those which were genuine, presented to third parties dealing in them all the appearances of having been duly issued, although, in fact, the agent had no authority to issue them, and although the exact extent of his authority was known. But these appearances were known to be false, by those who dealt directly with the agent; and with that knowledge, it is not pretended that they can assert any claim against the corporation. Such was the situation of Kyle.

It is as well, in this connection as any other, to notice a special feature of the transaction which I think imparts neither strength nor weakness to the plaintiffs' case. The

facts, as they appear in the finding of the judge, are, that Kyle received the certificate, not for his own but the agent's use, and having negotiated with the plaintiffs a loan by pledging it as security, paid the proceeds of the transaction over to the agent.    But these facts were not known to the plaintiffs.    They dealt with Kyle as the owner.    Upon that theory they have a right now to rely, and I understand them to do so.    It is the best the case will admit of.    If they chose to take the facts as they actually are, and to regard Kyle as a negotiator merely between them and the fraudulent agent of the corporation, they would then stand in the position of an immediate dealer with the agent, receiving from him a certificate of stock issued without authority; and this position, as I have shown, would be fatal to their claim.    They justly prefer to be regarded, and I do regard them, as third parties, dealing with Kyle as the apparent owner of stock.

In order to keep in view the exact conditions of the general question, I think it proper to state the conclusions which I consider thus far established.    They are as follows: 1. The certificate was void in the hands of Kyle, the first holder, because it was fraudulently issued, and he paid nothing for it; 2. It was also void in his hands, because issued by an agent without authority, there being no surrender of a previous certificate, and no transfer to him on the books of actual stock, and this want of authority was known to him; 3. It was void, because the stock it professed to represent had no existence, and could not exist under the charter of the company, all the powers of the corporation in the creation and issue of stock being exhausted.    In respect to the conclusion last mentioned, it must be, and I think is conceded, as a further result, that the certificate is void under all possible circumstances, so that no person, in whatever situation, can claim under it the rights of a stockholder, or damages on the ground of a refusal to admit him to such rights.    As the law will not require the defendant

to violate its charter by creating an excess of stock to supply this spurious certificate, so it will not punish it in damages for refusing simply to be guilty of such violation. I consider this result so necessary and so evident as not to require further discussion.

I will proceed, however, to a more particular examination of the plaintiffs' rights as the transferees of Kyle; and giving them the most favorable view of the case, will consider the certificate as void in his hands only on the grounds that it was issued fraudulently, without consideration, and without any authority contained in the terms of Schuyler's appointment as transfer agent. In this view, the defendant's corporation is regarded as competent to recognize the certificate; and if it is bound to do so, it must respond in damages upon its refusal. The question, therefore, will be, is it so bound? Or, to state it in another form, are the plaintiffs in a situation to assert any rights against the company which Kyle, their assignor, did not possess?

By the charter of this corporation, the shares of its capital stock were made transferable in such manner and in such places as the by-laws should direct; and the by-laws declared that all transfers should be made in the transfer book, kept at the proper office, and, where a certificate of the stock had been issued, that the same should be surrendered prior to the transfer being made. The certificate now in question, as all others, declared on its face the same conditions. This certificate has in fact never been surrendered, and no such transfer has ever been made. The plaintiffs, on making their loan to Kyle, took from him an assignment and power of attorney in blank, but paid no regard to the fundamental conditions on which alone a legal title to the stock could be transferred. Of these conditions of course they had notice.

I am aware it is common to deal in this manner in the stock of corporate companies, and I do not say that any rule of law or of public policy is violated by it. The dealer

undoubtedly acquires an equitable title to the stock of his vendor; and if the vendor's title is open to no impeachment, he has a right to call upon the corporation to clothe him also with the legal title, by permitting a transfer to himself on its books, and to demand a new certificate in his own name. But the question here is, not whether the purchaser is clothed in equity with all the rights of the seller, but whether by a transfer not made according to the laws of the corporation he acquires new and superior rights, as against the corporation itself; in short, whether his title is good when that of his vendor was good for nothing.

So, too, it is common to deal in this manner with respect to obligations of every description. If extreme caution is exercised, the purchaser will inquire of the maker of the obligation, and procure his admission of its validity and his assent to the transfer; and having done so, an estoppel will arise in his favor, not because he has invested his money in the purchase, but because he purchased after procuring such admission or consent and upon the faith thereof. Where there is no estoppel of this sort to rely upon, then the question, whether the transferee of an obligation apparently sound, and from the apparent owner, acquires any better right to enforce it than his assignor had depends on the nature of the obligation itself. The general and familiar rule is, that he does not. If the instrument has negotiable qualities, then he may. In the case of negotiable instruments, the legal title passes by mere endorsement or delivery. When they are not negotiable, an equitable title is all that can be acquired; and this suggests the further observation that, as between equities merely, the prior one, as a general rule, prevails. The prior equity, as well as the law, is in favor of the party who made the obligation, if for any good and valid reason he ought not to be bound by it. The principle is so familiar that authorities need not be cited.

It seems to me, therefore, that we are brought directly to the question whether certificates of stock in the defendants' corporation are to be regarded as negotiable instruments, in the sense of the commercial law, so that by their endorsement and delivery to a purchaser in good faith, a title to the stock they profess to represent may be acquired, although in the hands of the vendor they are spurious and void, and although the company itself has never recognized the transfer. This question, I think, must be answered in the negative. They contain, in the first place, no words of negotiability. They declare, simply, that the person named is entitled to certain shares of stock. They do not, like negotiable instruments, run to the bearer or to the order of the party to whom they are given. They commence, it is true, with the words "be it known," but such words have no tendency to show that they possess the quality claimed for them. A phraseology quite similar may be found in bonds and other instruments which no one ever thought to be negotiable.

But aside from the absence of any language of these certificates which can impart to them a negotiable character, both the laws of the corporation and the certificates themselves contain special restrictions, which seem to me to put this question at rest. I do not suppose that a corporation, without something very extraordinary in its charter, can place such restraints upon the sale of its stock, that the individual holder may not transfer as good a title in equity as he himself possesses by any mode of assurance good upon general principles of law. But if a natural person has an undoubted right so to express the terms of his obligation that it shall not be negotiable in the commercial sense, or in any sense which can give to the purchaser a title superior to that of his vendor, I see no reason to doubt that corporations possess the same right. Has the defendant so expressed itself in these certificates of stock? I think it has. It has distinctly declared, both in its

by-laws and on the face of the certificates, that shares can be transferred only on the books and on the surrender of the evidence of the previous owner's title. If an illustration were wanting of the value of such a restriction, it is furnished in the present case. But whatever its value, the restraint is lawful in itself, and one which the corporation had an undoubted right to impose. I do not say that it prevents the owner of stock from selling his shares by an outside transfer, so that the vendee will acquire in equity his own rights; but to say that the holder of a false and fraudulent certificate, by endorsing and delivering it to another person, can create a title hostile to the corporation itself, would be to deny to the restriction any meaning or effect whatever.

I have examined attentively the authorities cited upon the question, but do not find that the doctrine contended for has in them the least support. In the case of *Kortright* v. *The Commercial Bank of Buffalo* (20 *Wend.*, 91, *S. C. in error;* 22 *Wend.*, 348), it was held that an action of assumpsit will lie against a corporation, in favor of the assignee of a stock certificate, for refusing to permit a transfer on the books. This and the class of cases to which it belongs prove that a transfer not made according to the charter or by-laws of a corporation confers upon the transferee, in an equitable sense, the title of the previous owner; that, being thus clothed with the equitable title, it is the duty of the corporation to permit him to take a legal transfer on the books; and that the law will imply an assumpsit for the performance of that duty. For a breach of this duty, actions of assumpsit and case have been indifferently maintained. In principle, the remedy should have been a special action on the case. Such was the opinion of Chief Justice Nelson in the case referred to; but he says, "it being once settled (that assumpsit will lie), there is no occasion for disturbing it." It is only material to observe that the assumpsit is not in the certificate itself, and so passing by

indorsement and delivery to the transferee, but is implied after the transfer from the duty of the corporation to clothe the equitable owner with the legal title. Such cases, so far from tending to show that a dealer in certificates acquires rights better than those of the person with whom he deals, seem to me to justify quite an opposite conclusion. They necessarily assume that the change of title is incomplete until the proper transfer is made on the books.

In the case of *Fatman* v. *Loback* (1 *Duer*, 354), no question arose involving the rights of the corporation. The decision is directly opposed to that of Chancellor Walworth, in *Stebbins* v. *Phenix Fire Insurance Company* (3 *Paige*, 350), and my own impression is that it cannot be sustained. I find in it, however, nothing which can affect the question I am considering. The case was disposed of upon principles which were not asserted as having any peculiar application to dealing in stocks or negotiable securities. The case of *Stoney* v. *The American Life Insurance Company* (11 *Paige*, 635) only held that the negotiable security of a corporation, appearing on its face to have been duly issued, was valid in the hands of a *bona fide* holder, although, in fact, issued contrary to law. The case of *Delafield* v. *The State of Illinois* (2 *Hill*, 159) related to state bonds, payable to bearer and strictly negotiable. Such securities are sometimes called stocks, but a confusion of terms should not involve principles in obscurity.

In the case of *Fisher* v. *The Morris Canal and Banking Company* (3 *Am. Law Reg.*, 423), the question was whether the bonds of a railroad corporation, payable to bearer, issued for the purpose of raising money, with interest coupons annexed, also payable to bearer, were negotiable in such a sense that a purchaser for value took them free from any equities between the company and the seller. The decision was in favor of the purchaser, and I fully concur in the doctrine. The distinction between such a security and a stock certificate, which by its very terms is not negotiable,

and which is not a security for money at all, it seems to me is too plain to escape observation.

These are the only authorities cited in favor of the doctrine contended for. It is quite evident that they have no tendency in that direction. I will now mention some which are decisively the other way. In the case of the *Union Bank of Georgetown* v. *Laird* (2 *Wheaton*, 390), the stock was transferable only on the books of the corporation. The precise propositions decided were, that no legal title to shares could be acquired except by a transfer made according to the requirement, and that the equitable title of the transferee was subject to all the rights of the corporation against his assignor. The same doctrine was held by Chancellor Walworth, in *Stebbins* v. *Phenix Fire Insurance Company* (3 *Paige*, 350).

In the State of Connecticut there have been a series of cases going still further. There the registry on the books, when required by the charter or by-laws of a corporation, is deemed the originating act in the change of title to stock, and a transfer not so made is regarded as ineffectual for any purpose. (2 *Connect.*, 529 ; 3 *id.*, 544; 5 *id.*, 246 ; 6 *id.*, 552.) So rigorous a doctrine has not been followed elsewhere ; and I think the established rule now is, that a transfer of stock not made in the manner prescribed is nevertheless valid so as to pass in equity all the rights of the seller, but no greater. See, further, *Angell & Ames on Corporations*, 352, 353, 3*d* ed., where the rule is stated and the cases cited.

Looking at the question upon principle, I am not aware of anything in the nature or uses of this kind of property which requires an application of the rules which belong to negotiable securities. Stocks are not like bank bills, the immediate representative of money, and intended for circulation. The distinction between a bank bill and a share of bank stock it is not difficult to appreciate. Nor are they, like notes and bills of exchange, less adapted to circulation, but invented to supply the exigencies of com-

merce, and governed by the peculiar code of the commercial law. They are not like exchequer bills and government securities, which are made negotiable either for circulation or to find a market. Nor are they like corporation bonds, which are issued in negotiable form for sale, and as a means for raising money for corporate uses. The distinction between all these and corporate stocks is marked and striking. They are all in some form the representative of money, and may be satisfied by payment in money at a time specified. Certificates of stock are not securities for money in any sense, much less are they negotiable securities. They are simply the muniments and evidence of the holder's title to a given share in the property and franchises of the corporation of which he is a member. The primary use and design, I must be allowed to say, of this species of property, is to afford a steady investment for capital, rather than to feed the spirit of speculation. I am aware that people will speculate in stocks, as they sometimes do in lands, and there is no law which absolutely forbids it; but such, I am pursuaded, is not the use for which we should hold them chiefly intended.

The question is capable of some further elucidation, by attending to the rules which have been settled in regard to the transferability of other instruments and the effect of transfer. A certificate of stock is in some respects like a bill of lading or a warehouse or wharfinger's receipt. Each is the representation of property existing under certain conditions, and the documentary evidence of title thereto. They are all alike transferable by endorsement and delivery, and the title to the property thus represented passes by such transfer. So far they resemble each other, but there are distinctions to be noted. Bills of lading and wharfingers' receipts are commercial instruments, and their transferability, or, as it is sometimes termed, their " *quasi* negotiability," depends on the custom of merchants and the conveniences of trade. Certificates of stock are not commercial instruments, and

the title to the property they represent passes in equity only by indorsement and delivery, where, by any law or rule of the corporation, the transfer is required to be made on the books. With these resemblances and these distinctions, if a bill of lading is not negotiable in the sense which must be contended for in the present case, there is much greater difficulty in affirming that such a quality belongs to a stock certificate.

In the great case of *Lickbarrow* v. *Mason* (2 *Term Rep.*, 63; 5 *id.*, 367, 683), it was held that the consignor of goods had lost his right of stoppage *in transitu*, when the consignee, holding the bill of lading indorsed in blank by the consignor, delivered it to a third person, who received it in good faith and made advances upon it. This has been the settled rule ever since. But in such cases, it is to be observed, the legal title to the goods has vested by the sale and consignment in the consignee, subject only to the peculiar and anomalous right of arresting their delivery, in the event of insolvency. If, therefore, before this right is exercised, the consignee transfers the bill of lading to another person who takes it in good faith and for value, the latter acquires the title which his vendor had at the time of the transfer, and which the consignor cannot afterwards take from him by stopping the goods before they have reached their destination. In this doctrine, which was settled after a very remarkable contest in the courts of England, is contained all the negotiable quality that belongs to a bill of lading, and it requires but little discrimination to see that this is not negotiability in any just sense of that term. On the other hand, it has been held by the supreme court and the late court of errors of this state (*Everett* v. *Saltus*, 15 *Wend.*, 474; 20 *id.*, 267), that a bill of lading covering goods shipped, but made without the owner's authority, cannot affect the owner's title, into whatever hands the instrument may come. So it has been lately held in the English queen's bench (*Gurney* v. *Behrend*, 3 *Ellis & Bl.*, 622) that if a bill

of lading has been misappropriated, as if it be endorsed in blank by the consignor, and sent to his correspondent, but not intending thereby to have it transferred, and the person receiving the bill transfers it for value, the title to the goods is not affected by the transaction. Lord Campbell, in delivering the judgment in that case, very explicitly denied the negotiability of such instruments. In *Covill* v. *Hill* (4 *Denio*, 323), Chief Justice Bronson had occasion to say: "If the master of a vessel, after signing a bill of lading to the owner of the goods, should give one to another person, it would confer no rights upon those who were misled by the false and fraudulent paper." (See also *Zachrisson* v. *Ahman*, 2 *Sand.*, 68; *Commercial Bank of Rochester* v. *Cole*, 15 *Barb.*, 506.)

It is conceded that Kyle, the first holder of the certificate in question, could assert no title to the stock it appears to represent, and that in his hands it was spurious and void for all the reasons which have been mentioned. Before its transfer to the plaintiffs can be admitted to confer any better title upon them, it must be shown to have not only all the negotiable qualities of a bill of lading, but others also which that instrument does not possess.

Testing this question therefore in any conceivable mode, whether by the express terms of these certificates, by their general nature and character, by the authority of adjudged cases, or by the most favorable analogies, I have no hesitation in saying that the doctrine contended for is entirely without foundation. It is mainly by assuming for these instruments the possession in a greater or less degree of the peculiar qualities of negotiable securities, that the plaintiffs claim to have acquired by transfer better rights than their assignor had; and as that assumption fails, this claim must fall to the ground.

It was also said on the argument that those certificates of stock are in the nature of general letters of credit, on the faith of which any one might act; and upon this idea it

3 KERN.—40

was insisted that the defendant is in some way bound by the obligation in the hands of the plaintiffs. I am unable to see the analogy suggested. By attending to the mere definition of a letter of credit it will be seen there is no resemblance. Thus, in *McCulloch's Commercial Dictionary*, it is defined to be "a letter written by one merchant or correspondent to another, requesting him to credit the bearer with a sum of money." Or, to take the fuller definition of another writer, it is "an open or sealed letter from one merchant in one place, directed to another in another place, requiring him, that if the person therein named or the bearer of the letter shall have occasion to buy commodities or to want moneys, he will procure the same, or pass his promise, bill or other engagement for it, on the writer of the letter undertaking that he will provide him the money for the goods, or repay him by exchange, or give him such satisfaction as he shall require. (3 *Chitty, Com. Law*, 336; *Bouvier's Law Dictionary*.)

Now, while it may be the effect of a stock certificate to give the holder a credit, its terms do not request, invite or guarantee it. So the possession of property of any description, or of the evidence and muniments of title thereto, in their effect give to the possessor a credit with other men. In this sense every chose in action invites a credit in favor of him who holds it, and so do the title deeds of his real estate. Innocent parties may deal with him and be deceived. They may lend their money and lose it. Nothing more than this can be said of a certificate of the ownership of stock in a corporation. Regarded as a promissory instrument, imposing obligations to be performed by the artificial person which makes it, it is like any other chose in action, except as greater restrictions may be placed upon its transfer and sale. Regarded as a muniment of title merely, it is like any other instrument by which title is manifested. But to say that, like a letter of credit, it contains a request, express or implied, addressed to any one in particular, or to

the community in general, to deal with or advance money to the holder, or that it contains any assurance or guarantee addressed to the dealer of the safety of the transaction, is in my judgment to confound plain and long settled distinctions.

I will now briefly examine the validity of the plaintiffs' title in another aspect, still keeping out of view, however, the absolute want of power in the corporation to create the stock in question. It has been mentioned as one of the reasons why the certificate was void in the hands of Kyle, that Schuyler, the agent, was not acting within the scope of his powers when he issued it. The full effect of this particular objection upon the plaintiffs' rights, as the transferees of Kyle, has not been considered. And I observe now, in the first place, that if upon a vague theory of negotiability (already examined) they could overcome the difficulties arising out of the fraud of the agent toward the company as his principal, and out of the want of consideration, this objection would still have to be removed. It is obvious, upon a moment's reflection, that negotiability can impart no vitality to an instrument executed under a power where the agent has exceeded his actual or presumptive authority. Whoever proposes to deal with a security of any kind appearing on its face to be given by one man for another, is bound to inquire whether it has been given by due authority, and if he omits that inquiry he deals at his peril.

It is not denied that the plaintiffs, in taking the certificates in question, were chargeable with notice of the extent and limit of the powers of Schuyler as transfer agent. All that is claimed in their behalf is, that his act in issuing it was apparently and presumptively, although not actually, within his authority. Upon this ground it is urged that, according to the rules which govern the relation of principal and agent, the defendant is bound in some way to make the obligation good. The extent of the authority, it is admitted, the

plaintiffs knew, or were bound to know; but it was not known, they say, that the act done was not within such authority.

There are in the books many loose expressions concerning the distinction between a general and special agency. The distinction itself is highly unsatisfactory, and will be found quite insufficient to solve a great variety of cases. It is not profitable to dwell upon that distinction. Underlying the whole subject there is this fundamental proposition, that a principal is bound only by the authorized acts of his agent. This authority may be proved by the instrument which creates it; and beyond the terms of the instrument, or of the verbal commission, it may be shown that the principal has held the agent out to the world in other instances as having an authority which will embrace the particular act in question. I know of no other mode in which a controverted power can be established. But in whichever way this is done, it cannot be limited by secret instructions of the principal on the one hand, nor can it be enlarged by the unauthorized representation of the agent on the other. These principles, I think, are elementary.

But suppose an agent is authorized by the terms of his appointment to enter into an engagement or series of engagements on behalf of his principal, and while the appointment is in force he fraudulently makes one in his own or a stranger's business, but in the form contemplated by the power, and which he asserts to be in the business of his employer, by using his name in the contract, can the dealer rely upon that assertion and hold the principal, or is he bound to inquire and to ascertain, at his peril, whether the transaction is not only in appearance but in fact within the authority? According to the decision of the supreme court of this state, in the case of *The North River Bank* v. *Aymar* (3 *Hill*, 262), he can. There the agent was authorized to draw and endorse notes in the name and for the benefit of his principal. He drew various notes, which in their ap-

pearance were within the power, but really had no connection with the business of his principal. The plaintiff's bank, which had the letter of attorney in its custody, discounted them, and it was held they could be recovered against the principal. Justice Cowen and Chief Justice Nelson delivered opposing opinions, in which the question is very elaborately discussed. The decision was reversed in the court of errors, but the case is not reported in that court. The reversal, however, proceeded, as I learn, upon a doctrine directly opposite to that held by the supreme court. The case therefore certainly suggests a limit of great importance to the liability of principals, the recognition of which would be decisive of the present controversy. So in *Grant* v. *Norway* (10 *Com. Bench*, 665), it was held, after full discussion, that the master of a ship signing a bill of lading for goods not actually shipped was not to be considered the agent of the owner of the vessel, so as to make him responsible to one who made advances upon the faith of the bill. That is a strong case. The master is the general agent of the owner as to all matters within the scope of his duty and employment, and has unquestionable power to sign bills of lading for goods shipped; and every bill asserts, as it did in that case, that the goods are received on board. The act, therefore, judged by its appearance and the representation of the agent, was strictly within the power. But the principal was held not to be liable, because it was not so in fact. The doctrine of that case was affirmed by the English court of exchequer, in *Hubbertsey* v. *Ward* (8 *Exchequer Rep.*, 330, *S. C.*; 18 *Eng. Law and Eq. Rep.*, 551), and again with great deliberation by the common pleas in *Coleman* v. *Riches* (29 *Eng. Law and Eq. Rep.*, 323).

The distinction is not always attended to between the apparent powers of an agent and his acts apparently but not really within the power. An agent's apparent powers are those which are conferred by the terms of his appointment. notwithstanding secret instructions, or those with

which he is clothed by the character in which he is held out
to the world, although not strictly within his commission.
Whatever is done under an authority thus manifested is
actually within the authority as to third persons, and the
principal is bound for that reason.   But it is obvious that
an agent may clothe his act with all the *indicia* of authority,
and yet the act itself may not be within the real or apparent
power.   The appearance of the power is one thing, and for
that the principal is responsible.   The appearance of the
act is another, and for that, if false, I think the remedy is
against the agent only.   The fundamental proposition, I
repeat, is, that one man can be bound only by the autho-
rized acts of another.   He cannot be charged because
another holds a commission from him and falsely asserts
that his acts are within it.

Cases may often arise which to a casual observation might
appear to be within the principles stated, but which really
are not.   Thus an agent may be authorized to give notes
for his principal in order to raise money to be used in the
business of the latter.   A third person may inspect the
power, advance the money in good faith, and the agent
appropriate it to his own use.   In such a case, I should hold
the principal responsible, not because the act of the agent
appeared to be within the authority, but because the autho-
rity actually included the transaction.   A power given to
an agent to borrow money, upon notes or otherwise, implies
that the money may be paid to him, and so the whole
transaction is strictly and literally authorized.   But suppose
the power to give the note is on its face conditional.   It
then has no existence until the condition has been fulfilled.
To a confiding dealer who believes that the agent would
not do an improper act, the note will certainly carry
the appearance of due authority; but if it turns out that
the conditions had not occurred on which the exercise of
the power depended, then he has trusted to the representa-
tion of the agent, and, I think. must look to him alone.   As

the principal never authorized the transaction at all, he is bound neither by the contract nor by the representation. If not by the former, then it is extremely plain he is not by the latter.

Connected with the observations last made, it is proper, though perhaps scarcely necessary, to notice another doctrine which has been much urged, under some disguise it is true, but in effect, that the very employment of an agent to situations of trust and confidence is a recommendation and certificate of his character, so that if he deceives others to their injury, the principal must make compensation. If by this it were only meant that where the agent is guilty of fraud or deceit in doing his employer's business, the latter is responsible, the doctrine is entirely true. (*Story's Agency*, § 452, *and cases cited.*) But in all its other aspects and forms of statement, the doctrine is unsound. If the agent, in dealing for his principal and within the power, commits a fraud, the principal is liable; not upon the ground that he holds the agent out to the world as an honest man, but because the fraud enters into and is a part of the authorized transaction. If the agent deals dishonestly for his principal it is in a just sense a wrong done by the principal himself although unknown and unauthorized. But the dealing itself must be authorized. If the transaction is not within the power, then, as the dealing is imputed to the agent personally, so, necessarily, are all the circumstances attending it, and all the means and instrumentalities by which the fraud is consummated. The power of the agent to charge his principal by doing a wrong must be traced directly to his authority, and it cannot be referred to an increased facility for imposing on the credulity of others, derived incidentally from his appointment to a situation of trust. If the fraud consists in an over representation of his power to act, by which others are drawn into dealing with him, then it is a self-evident proposition that a man can no more enlarge than he can create a power by such a representation.

Applying the principles which have been stated in this branch of the discussion, they are decisive against the plaintiffs. If the corporation had held stock, and Schuyler had been the agent to sell it and issue certificates therefor, a sale and a certificate issued by him would have been valid against his principals, although by a private fraud he applied the proceeds to his own use. The transaction with the purchaser in all its branches, the sale, the certificate and the payments to him of the money, would have been not only apparently but actually within the powers. His misappropriation of the proceeds would have been a mere breach of trust relating to moneys in his hands, and, upon the principles of trust, his intention to misappropriate would not affect an innocent party.

But such were not the relations between Schuyler and the corporation; nor was he held out to the world as standing in such relations. He had no power to sell stock at all, and none to issue certificates, except as incidental to a sale between existing stockholders; and then it depended on the conditions precedent, of a transfer on the books and a surrender of a previous certificate for the same stock. The authority which he assumed to exercise, therefore, confessedly never had an actual existence; and within the principles which have been stated it never had an apparent existence. His appointment, in its very terms, which all dealers are supposed to have been acquainted with, did not include his acts, and there is no pretence that the authority it conferred was ever enlarged by any holding out or recognition of such acts. All that can be said in behalf of the plaintiffs is, that the certificate itself implied a representation or assurance that it was issued within the power; in other words, that the conditions on which the power depended had been fulfilled. Even this representation, when closely scanned, was no more than an inference of the dealer that, as the agent had no authority to certify except under conditions, those had been in fact performed. But the

conclusive answer is, that the defendant never authorized any such representations. To say that it had, would be simply saying that it authorized the certificate, because the representation was contained in that and existed no-where else; and this would be assuming the very point in dispute. The representation or assurance, therefore, if such we call it, was the unauthorized act of the agent. Upon this the plaintiffs naturally, no doubt, relied; and so, doubt-less, the dealer did upon the bill of lading in *Grant* v. *Norway* (*supra*), which contained an express declaration that the goods were shipped. The precise difficulty is, that they relied upon the appearance which the agent gave to the act, and by that they were deceived. They were under no deception as to the power in its real or apparent scope. Testing the question by any rule of agency with which I am acquainted, the defendant was not bound by the trans-action.

If any one of the main conclusions at which I have arrived in this discussion is sound, there is no remaining ground on which the action can be sustained. Viewing the certificate in question as unaffected by the want of power in the corporation to create or recognize the stock it appears to represent, we have seen that it was void in its origin, because issued without consideration and in fraud of the defendant's rights. We have also seen that those objections were equally fatal to its validity in the hands of the plaintiffs, as the assignees of the first holder. It has been further shown that the instrument imposed no obliga-tion or duty on the defendant, upon the more special ground that the act of Schuyler, in issuing it, was not within any authority which it ever, in fact or in pretence, conferred upon him as its agent; and, if this objection is sound, the further observation has been made, and I doubt not assented to, that it cannot be overcome by allowing to the certificate the transferable quality and immunity which belong to negotiable paper. Unless these conclusions can

be overthrown, they are subversive of the entire ground of action.

The notion of estoppel, which has been advanced in the argument, not as a distinct ground of liability, but blended with other principles, deserves, by itself, very little con sideration. Every corporate as well as private obligation or instrument undoubtedly contains an express or implied representation of facts, upon the faith of which innocent parties may deal. If it be a promissory note, value received is a fact expressed or implied; and although the fact may not be so, the maker is bound to pay the obligation in the hands of an innocent third party, not upon any theory of estoppel, but upon principles peculiar to that species of security. Where the instrument is not negotiable, the maker may, as I have heretofore observed, be affected by an estoppel *in pais*, if it be transferred upon his representation of its validity, and the dealer acts upon that representation. But to say that he is estopped by the instrument itself, simply because he made it and a third party has dealt with it, is only asserting in another form that fraud, mistake, duress, illegality, want of consideration or want of authority, when the act is one of pretended agency, is no defence. This would subvert the settled maxim that the assignee or purchaser takes subject to all equities between the original parties. It would also subvert another maxim which belongs to the doctrine of estoppel itself. That maxim is, that an admission or representation is no estoppel in favor of a stranger to whom it is not made, and whose conduct it was not expressly designed to influence. (3 *Johns. Cas.*, 101; 6 *Hill*, 534; 3 *id.*, 215; 7 *Barb.*, 644.) The result is, that before the principles of estoppel can be applied to this controversy, it must be asserted and proved that a certificate of stock, differing from all other modes and forms of obligation used in the transactions of men, contains within itself a representation or admission of facts which any dealer, however remote from the original parties,

may accept as addressed to himself, and intended to influence his conduct. For such a doctrine no authority has been cited, and it has no foundation in any principle hitherto recognized.

As I have once mentioned, a theory of the action prominently urged upon the argument assumed that the corporation had no power to create more than the original three millions of stock, or to issue certificates for a greater amount. That this is so, I think I have demonstrated. But assuming these premises, it was then insisted that the certificate in question was therefore false, and that the action would lie on this ground. The essential principles of the case in this view would be, that as the defendant, for want of corporate power, *cannot* recognize the certificate as the true representive of stock, and so respond to the engagement which it implies, it must make compensation in damages for the injury sustained in consequence of the representation regarded as false.

Now, by presenting the *falsehood* alleged in the certificate and the consequent injury as the ground of the action, a plausible appearance is given to this view of the case. But it is essentially illogical. The falsehood, viewed in this aspect alone, really consists in a want of corporate power to enter into the engagement; and that, instead of being *a cause* of the action, is a serious difficulty to be removed. If an agent, irrespective of all questions arising out of the special limitations of his own authority, as derived from the board of directors, cannot bind a corporation, or affect the rights of its genuine stockholders by the *terms* of an over-issued certificate, there is great difficulty in affirming that the result may be indirectly reached by thus changing the ground of liability. If a corporation has received the benefit of its agent's misrepresentation or fraud in a transaction unauthorized by its charter, I will not say there is no mode of redress. I am not an advocate of the doctrine that a corporation cannot be responsible for a wrong, or may not

in some form be liable when its agents entered into engage-
ments which its charter forbids, and the benefits of the
transaction can be traced to its stockholders, or are held for
their benefit. But such is not the case before us. The
stockholders of this corporation are in no wise connected
with the misconduct of their agent, nor have they been
benefited by it. It is true they trusted him, but it is not
alleged that they had not ample reason for so doing. Con-
ceding that Schuyler's authority, derived from his appoint-
ment as transfer agent by the board of directors, might
apparently include his fraudulent acts, the difficulty is only
removed one step further back. The directors themselves
were not the corporation, but its agents only. It may be
granted that they wielded all the corporate powers, but
among those powers the one in question is nowhere to be
found. It did not even have *apparent* existence. The
argument concedes this absolute want of power, and I have
yet to discover the principle on which the genuine stock-
holders can be made liable in any form for an attempt to
exercise it, by any of their agents, for their own individual
benefit.

But such a point need not be determined. Before reach-
ing this ultimate question, the action fails upon the special
grounds which have been examined at large. Conceding
to the defendant the power, if it so elect, to recognize
and perform the obligation under which its agent
attempted to place it, then, if it is not liable upon
its refusal to do so for the reasons which have been
stated, it is extremely plain it is not if the power to do
so is wanting. To say that its agent's false representa-
tion of stock which did not and could not exist can render
it liable to dealers in the spurious certificates, when it
would not be bound to recognize the same dealers if the
stock in fact existed, and the representation therefore true,
involves a fallacy so evident that it needs only to be sug-
gested. This is the error in the argument which places the

Mechanics' Bank *against* New-York and New Haven R. R. Co.

defendant's liability on the simple ground that the certificate is a fraudulent representation of non-existing stock, the alleged fraud consisting in the statement of that falsehood alone. In this view of the controversy, the other fatal objections to the action are overlooked. If I have been successful in showing that the plaintiffs can have no title to the shares of stock mentioned in the certificate, for the particular reasons which have been given, then manifestly the non-existence of the shares, or the false assertion of their existence, is no ground of complaint:

In concluding, it is proper to say that the case of *The Bank of Kentucky* v. *The Schuylkill Bank* (1 *Parsons' Select Eq. Cases*, 180) has not been overlooked. That case has been much relied on as an authority in point upon the general question before us, and it is certainly true that in the opinion delivered on pronouncing the judgment some principles were stated scarcely reconcilable with the conclusion to which we have come. In that case, however, the suit was brought by the corporation against its own fraudulent agent, after it had recognized the spurious issue under an enabling act of the legislature; and in many essential circumstances the controversy differed from the present one. After a careful consideration, we are unable to yield to that decision any controlling influence upon the question now to be determined.

The judgment should be reversed and a new trial ordered.

All the judges, except SELDEN, J., who took no part in the decision, were in favor of reversing the judgment and granting a new trial.

Judgment accordingly.

*[The residue of the cases decided at June term in the next volume.]*