Seldeh, J.
This case presents two questions: 1. Whether, under the facts<disclosed, the firm of Haven, Sloat & Co., are liable at all to the plaintiff; and, 2. If liable, whether that liability can be enforced in the present action.
o.The principles upon which partnerships are held responsible for the acts of one of the partners, are analogous to, and in most cases identical with, those upon which employers are bound by the acts of their agents. The defendant, Wright, is to be regarded as the general agent of the firm as. to all matters within the' scope of the partnership business, and the liability of his partners in the present case depends mainly upon a question arising upon the law of principal and agent, which has .been discussed in several recent cases, and especially in the cases of Mechanics' Bank v. New York and New Haven Railroad Company (13 N. Y., 599), and Farmers' and Mechanics' Bank v. Butchers' and Drovers' Bank (16 N. Y., 125), S. C. (14 Id., 623.)
In the former of these cases, the plaintiff sought to recover for a fraud committed by Robert Schuyler, who was the agent of the Railroad Company for transferring its stock. The ■.alleged fraud consisted in issuing to one Kyle a spurious certificate for eighty-five shares of the capital stock of the Company, and thus. falsely representing that Kyle was the owner *598 of such stock, when in truth he owned no stock, and was not entitled to the certificate. Kyle had borrowed money of the plaintiff, and assigned the certificate as security.
olt was a suificient'answer to the action, that Kyle, to whom the certificate was issued, being privy to the fraud, had, of course, no claim against the Company, and that his' assignees could have no greater rights than himself. ■ But the learned judge who delivered the only opinion which has been reported in that case, seems to have put the decision upon other grounds. He assumed that the principal is never bound by the act of his agent, unless he has in reality authorized it, or has, by his declarations or conduct, given to the agent- a semblance of authority for its performance. The act must, he insisted, in all cases, be brought within, the actual or apparent powers of the agent. ■
This is, doubtless, a sound general rule, but there are, I apprehend, some exceptions. It is admitted in that opinion, that the principal is responsible for a false representation by his agent, not authorized by or known to the principal, if such representation is made in connection with an act which the principal has authorized. But this, it is said, is “ because the fraud enters into and is a part of the authorized transaction.” This reasoning was not, as we have seen, necessary to the conclusion at -which the court arrived. ° There is a class of cases to which it does not, in my opinion, apply, viz., cases where the act of the agent, so far as the party dealing with him has any means of discovering, is within the power, but where, by reason of some fact known to the agent and concealed or misrepresented by him, it in reality exceeds his power. Take, for example, the case of a forwarder who carries on his business through an agent. Such agent would, from the nature of the business, have power to give written acknowledgments of the receipt of property to be transported; but would, whether specially restricted or not, have no authority to give such an acknowledgment when no property had been received; and every person dealing with him would be bound to take notice of this, limitation of his powers. Suppose, then, a dealer in produce *599 to apply to a banker for the discount of a draft drawn against property alleged to have been delivered to this.agent to be transported to market, and to produce the written statement of the agent, addressed to the banker himself, acknowledging the receipt of such property, upon the faith of which the draft should be discounted. «Here the act of the agent, the facts being known, would be within neither the real nor apparent powers of the agent. And yet to hold the principal not liable, would, I think, do great injustice, and would seriously disturb a very extensive system of trade, o The question is, who is to bear the consequences of this false and fraudulent representation of the agent ?
In the opinion in the case of The New York and New Haven Railroad Company (supra), it is argued, in reference to cases of this sort, that “ a man can no more enlarge than he can create a power by* any representation which he can make.”
■ This is, no doubt, strictly true. But the answer is, that in the case supposed, and others of that class,»the fact, misrepresented forms no'part of the power itself. ° The precise extent of the power admits of no doubt. It is known to all the parties concerned. »But there is a fact dehors the power, well known to the agent, but misrepresented by him, which prevents his having a right to act. <> Who, in justice, should be responsible for this fraud of the agent ? It seems to me eminently a case for the application of Lord Holt’s rule, thafcwhere one of two innocent parties must suffer from the fraud or misconduct of a third, he who has reposed a trust and confidence in the fraudulent agent ought to bear the loss. (Hern v. Nichols, 1 Salk., 289.) The existence of any such rule was, as I understand, virtually denied in the opinion referred to, in the case of the New York and New Haven Railroad Company. This denial was essential to the maintenance of the principles there laid down, as the rule, if admitted, would embrace many cases which could not be reconciled with those principles. It would seem, however, too reasonable in'itself, and too well established by authority, to be shaken. It has been quoted and adopted by many eminent judges, as well as by nearly *600 every elementary writer upon the law of principal and agent, since the days of Lord Holt. One or two only of these authorities will be referred to here, for the purpose of bringing out a single idea.
The liability of principals for the negligence and for the frauds of their agents rests upon the same grounds. The language of Lord Holt, in Hern v. Nichols, was evidently the result of a settled opinion, as he had previously laid down the same rule in reference to the liability of a principal for the negligence, of his agent. In the case of Lane v. Cotton (12 Mod., 472, 490), he says: “ For when a trust is put in one person, and another whose interest is intrusted to him is damnified by the neglect of such as that person employs in the discharge of that trust, he shall answer for it to the party damnified.” Paley, in his work on Agency (p. 294), treats of the liability of principals for the negligence and frauds of their agents, in the same section, and places the language just quoted from Lord Holt at its head. Mr. Justice Btiller, also, in the case of Fitzherbert v. Mather (1 T. R., 16), adppts the same classification and confirms the rule in the following emphatic terms: “It is the common question every day at Guildhall, where one of two innocent persons must suffer by the fraud or negligence of a third, which of the two gave credit?” Again, Mr. Ohitty says: “ Though a principal is not in general liable, criminally, for the act of his agent, yet he is civilly liable for the neglect, fraud, deceit or any other wrongful act of his agent in the course of his employment, though, in fact, the principal did not authorize the practice of such acts.” (3 Chitty’s Com. Law, 209.)
If this classification is correct—and it is concurred in by all elementary writers —then0the idea that the responsibility of a principal for the frauds of his agent rests in all cases upon the ground that he has in some way, either actually or apparently, authorized the fraudulent act, or has received the benefit of the fraud, and therefore adopted it, must be given up. o It would be a very artificial and unnatural mode of reasoning that should apply that doctrine to the principal’s liability for *601 the negligence of his agent; and this liability and that for fraud belong to the same class, and rest upon the same reason, n That. reason is, that every person employing an agent is under obligation to pay some regard to the diligence, skill and integrity, of the agent he selects, and to his fitness to perform the duties with which he is charged. The decision of this court in the case, of the Butchers' and Drovers' Bank (supra), was placed explicitly upon this ground, and can be sustained upon no other. The act of the teller in that case in certifying the checks was wholly unauthorized. There was not even a semblance of authority, if the holder was bound to ascertain whether the drawer had funds to meet them. The court, nevertheless, held the bank liable, and every judge who wrote in the case (except Judge Comstock, who dissented), concurred in the rule laid down in the case of the North River Bank v. Aymar (3 Hill, 262). This rule is restated in the case of the Butchers' and Drovers' Bank, as follows: “Where the party dealing with an agent has ascertained that the act of the agent corresponds, in every particular in regard to which such party has or is presumed to have any knowledge, with the terms of the power, he may take the representation of the agent as to any extrinsic fact, which rests peculiarly within the knowledge of the agent, and which cannot be. ascertained by a comparison of the power with the act done under it.”
It is insisted in the present case that the decision in the case of the Butchers' and Drovers' Bank proceeded upon some principles applicable solely to negotiable paper, and which have no application here. This certainly is not the case in respect to the opinion published in 16 Hew York Reports (p. 125); arid although the reasoning of Judge Denio (14 N. Y., 623), is based mainly upon rules drawn from the law of negotiable paper, yet the opinion of Judge Cowen, in the North River Bank v. Aymar, which the Chief Judge especially commends, argues the question throughout upon the law of principal and agent, and not at all upon principles peculiar to negotiable paper. He also cites Lord Holt’s rule, in the case of Hern v. Nichols, as the basis of the defendant’s liability.
*602 JSTo doubt the negotiable character- of the paper was essential to the plaintiff’s right of action, both in the case of Aymar and that of the Butchers' and Drovers' Bank, because the only representation by the agent was in assuming to be authorized to execute the paper, and this being made primarily to another party, himself cognizant of the fraud, would, aside from the negotiable words; have afforded no ground of action to the plaintiff. The cases would then have been precisely like that of the New York and New Haven Railroad Company. But by means of the negotiability of the paper, a direct privity was created between the maker of the paper and the holder. The law merchant gives effect to a negotiable instrument, according to its terms. As those terms import a dealing between the maker and each person to whom the instrument may be transferred, it is so treated. Hence any representation upon the face of paper of this description, is considered as made directly to every one who may become its Iona fide holder. (Polhill v. Walter, 3 B. & Ad., 114.) The mere assumption by a partner ' or agent of power to execute such paper, is a virtual representation to all who may take it of the existence of every fact essential to the power. In no other respect was the negotiability of the paper of any importance in the two cases referred to.
' These cases, therefore, must' be considered as establishing the doctrine, that where the authority of an agent depends upon some facts outside the terms of his power, and which, from its nature, rests particularly within his knowledge, the principal is bound by the representation of the agent, although false, as to the existence of such fact. - There is no difference in this respect between the liability of the principal for the fraud of his agent, and that of a partnership for the fraud of one of its members. Judge Stoby, in treating of the liability of partnerships in such cases, says: “ The whole doctrine proceeds upon the intelligible ground, that when one of two innocent parties must suffer by the act of a third person, he shall suffer who has been the cause or the occasion of the confidence and credit reposed in such third person.” (Story on Part., *603 § 108.) / Mr. Collyer, also, places this language of J udge Sturt at the head of the section in which he treats of this class oj liabilities, and expressly applies the principle to the case of negotiable securities, fraudulently issued by one of the partners. (Collyer on Part., Perkins’ ed., p. 401, §§ 445, 447.)
It is clear, therefore, that cases like those of the North River Bank v. Aymar, and The Farmers' and Mechanics' Bank v. The Butchers' and Drovers' Bank, as well as that entire class of cases in which it has been held that a partnership is liable to a bona fide holder upon a negotiable note fraudulently issued in its name by one of the partners, all depend upon one common principle. > The mode in which the liability is enforced in all these cases is by estoppel in pais. ° The agent or partner has in each case made a representation as to a fact essential to his power, .upon the faith of which the other party has acted, and the principal or firm is precluded from controverting the fact so represented. The applicability of the doctrine of estoppel to cases in all respects parallel to these, is asserted by Judge Denio in the case of The Genesee Bank v. The Patchin Bank (3 Kern., 309). The ground .of liability and mode of enforcing it, by estoppel, in the case of the certified checks, was precisely the same as if the teller, instead of writing the word “ good ” upon the face of the checks, had simply answered verbally to the inquiry of a person, about to take the checks, that the bank had funds of the drawer to meet them, and the action had been brought by the person to. whom such statement was made. The teller would be the proper source of information on the subject, and whether bound to answer such inquiry or not, if he chose to do so, the bank, upon the principles which have been adverted to, would clearly be bound by his answer, and would be estopped from controverting it ■ by proof. I see no. way. in which the present case can be distinguished in principle from such a case, or from the class of cases to which I have referred. The plaintiff knew the extent of Wright’s powers, that is, that he had no right to give the receipt or make the representation, unless the grain had been actually received; but he could ascertain-the fact'whether it *604 had been so received only through Wright himself. A personal examination of the warehouse would not have enlightened him, as it could not be distinguished from other grain of the same sort. If, then, the firm is not liable, there is no security in dealing with property represented to be in the hands of warehousemen or forwarders.
There are some English cases which have been frequently cited in opposition to the doctrine adopted in this case, and which, although briefly commented on in the case of The Butchers' and Drovers' Bank, it may be well again to noticq, as a more extended analysis will show, I think, that they are of very little weight as opposed to that doctrine. The first of these cases is that of Grant v. Norway (10 C. B., 665). The master of a ship, owned by the defendants, had signed and delivered a bill of lading, in the usual form, for goods which had never been shipped. The plaintiffs, upon the faith of this bill of lading, and upon its deposit with them, had made advances to the parties appearing by the bill to have shipped the goods. Upon discovering that no goods had been shipped, they brought their action against the owners of the ship.
¡Now, upon the principles maintained here, this was a very plain case. The parties to whom the bill of lading was .given had, of course, no right of action, because they were cognizant of the fraud, and the plaintiffs had none, .because no representation was made to them. Had the bill of lading been a negotiable instrument, .the plaintiffs would have been in precisely the same position as persons who become honafide indorsers of the negotiable note of a partnership fraudulently issued by one of the partners. A privity between the parties would then have existed through the negotiable character of the paper, and the defendants would have been estopped by the act of their’ agent from setting up that no goods had been shipped.
The case was argued before three judges only, and it appears from the course of the argument that, while the attention of the Chief Justice was wholly given to the question whether the act of the agent was within his powers, that of Creswell, J., *605 was directed mainly to the view of the case which I take. For the latter judge not only distinguishes the case from that of Hern v. Nichols, upon the precise ground taken here, as is shown by the language quoted from him, in the case of The Butchers' and Drovers' Barde, but subsequently he puts this case: “ Suppose this were not the case of an indorsee of a bill of lading, but that of the owner of the goods, who really sent them by a carrier for the purpose of their being shipped, and the master gives a receipt to the owner of-the goods, but the carrier fails to deliver them ; in that case the owner would be induced, by the captain’s receipt, to abstain from pursuing the thief; but is the indorsee of the bill, under the circumstances supposed, in the same position as the original owner of the goods ?”
This • supposition clearly shows the judge who made ■ it to have, for the moment at least, adopted the views which I have presented, for he puts the case in the precise form to obviate the objections, which I say existed, to a recovery by any one against the owners of the ship, viz.: the want of any representation at all to the plaintiffs, and the knowledge by the party to whom the representation was made, that no goods had been shipped.
The opinion of the court, which was delivered by the Chief Justice, is not in conflict with these views, though it does not support them. It purports to establish two points, in which I entirely concur, viz.: 1. That the master had no„authority to sign a bill of lading for goods not shipped; and 2. That persons dealing with him were presumed to know that his powers were thus limited. But, as to the question whether a false representation that the goods had been shipped, made by the master directly to an innocent party, who should act upon such representation, would bind the owners, the opinion is entirely silent. This is a view of the case which the Chief Justice evidently had not considered:
In the subsequent case of Coleman v. Riches (29 Law & Eq. R., 323), the point here discussed forced itself upon his attention. The defendant, Riches, was a wharfinger, his business *606 being in charge of one Board, as his agent. The plaintiff, Coleman, was a dealer in produce, and in the habit of buying gram to be delivered at the defendant’s wharf, and paying for it upon the receipt of Board, the agent. The plaintiff purchased a quantity of wheat of one Lewis, and ordered it delivered at the defendant’s wharf. .He afterward met Lewis and Board”, the agent, together, and Lewis stated, in Board’s presence, that he had delivered the wheat, at the same time, producing and delivering to the plaintiff Board’s receipt. The action was against Biches, for the misrepresentation of his agent, contained in the receipt.
Upon the argument the Chief Justice, among other things, remarked, that “ the misrepresentation was in fact made by ■Lewis, though Board enabled him to make it, and was present' when he made it;” and thereupon Creswell, J., said: “Biches or his agent made the representation as to the receipt to the party who delivered the goods, and not to the buyer.”
These remarks recognize most distinctly the real difficulty in the case, which was, to make it appear that the false representation had been made by the agent, Board, to the plaintiff. To establish this, the counsel argued that, as Biches knew that the receipts were given for the purpose of being taken to the plaintiff, they were to be regarded the same as if given directly to him. But to this Jervis, Ch. J., and Williams, J., replied, in substance, that they were unable to see how it could be made out that the representation was made to Coleman, the plaintiff
It is quite apparent, therefore, that if the agent of Biches • had made the false, representation, as to the delivery of the wheat, directly to the plaintiff Coleman, the action would have been sustained. This inference is strengthened by what is said by the Chief Justice in his opinion, in which he admits that if Biches had agreed with Coleman, that such; receipts should be given, the case would have been different. He did not, of course, mean an agreement that the agent should give receipts for wheat not delivered. ' The receipt would still have been, if the supposed agreement had existed, without even the *607 semblance of authority, a mere false representation by the agent. The only difference the agreement could make would be to create such a privity of dealing between Riches and Coleman as to cause the receipts, although given in the name of the vendor of the wheat, to be treated as if given directly to Coleman, the purchaser. This coincides with the view which I have taken of the present case. These two cases .have been dwelt upon thus at length, because, although frequently cited and relied upon 'in opposition to the position taken here, I think, when closely examined, they tend rather to Confirm it than otherwise. 01 have no hesitation, therefore, in holding that, under the circumstances of this case, the defendants were bound by the representations of Wright—I mean the verbal representations, and not the representations contained in the receipts. Although he may not have been bound to answer the inquiry as to the wheat, yet a warehouseman cannot but be considered as acting in the proper line of his business in answering such inquiries respecting the property he has in store; and if he consents to answer, is bound to answer truly. It cannot bé material whether he is questioned on the subject at his warehouse, or elsewhere—the inquiry being addressed in the way of business, by one known to be about to act on the information which may be given in reply. As a matter of evidence, bad faith would be much less readily attributed to one'answering such inquiries away from his place of business, if the case were open to a presumption of mistake; but whatever circumstances may attend the inquiry, absolute good faith must be alike required in the answer.; ...
The" only refnaining question is, whether the plaintiff can enforce his claim-in the present action, the complaint in which does not. purport to claim damages for the fraud of Wright, but for the- conversion by the defendants of property belonging to the plaintiff. Although an actual conversion is not averred, yet a demand .and refusal, which are evidence of a conversion, being alleged, a conversion forms the gist of the action. There would,- no doubt,/be an incongruity in permit *608 tiñg a recovery in such an action for property shown never to have had an existence. But the plaintiff in this case objected upon the trial to all proof on that subject. If this objection was well taken, the case, as now situated, is to be disposed of as if no such evidence had been received. A new trial cannot be properly granted upon evidence which was objected to, and improperly admitted. The defendant’s counsel is, as I think, wrong in assuming that it appeared from the plaintiff’s own showing that the grain had no existence.. „ •
Were the defendants, then, estopped, by the representations * of Wright that the grain was in store, from proving the con-1 trary upon the trial? The only elements of an estoppel in pais are, the assertion of a fact by one party, and such action " by the other party, in reliance upon the assertion, that he will be injured and virtually defrauded, if the fact asserted is ,dis- . ' proved. It would seem difficult to imagine a case more directly - within the doctrine than the present. If the firm is bound at all by the representations of Wright, it would seem, upon ,• principle, that it must be estopped from proving the contrary.
The case of Austen v. Craven (4 Taun., 644), is relied upon to show that an action of trover would not lie in such a case. But that case differed essentially from this. It was founded upon a mere executory contract for the delivery of a certain quantity of sugar of a certain description. The party under whom the plaintiff claimed had never been entitled to any specific .sugar, and this necessarily appeared in the case. When the plaintiff’s counsel attempted to argue from- the defendants’ admission, that the sugar must have been separated from the bulk of the stock, GriBBS, J., interposed, saying: “Their language is explained by the other evidence.” It is obvious, therefore, that the case was decided upon the ground that, taking the whole evidence together, the defendants had not admitted the possession of any specific sugar to which the plaintiffs’ assignor had title. The opinion of Mansfield, Oh. J., shows that this was the ground of the decision. The present case is entirely different. Here the representation of Wright, if taken as true, showed the defendants in possession *609 of certain specific grain delivered to them by Ford. There was no such difficulty as existed in Austen v. Craven.
The case of Harding v. Carter (Park on Ins., 40), is far more like the present. The defendants in that case, who were brokers, had written to the plaintiff, the master of a ship, that they had effected two policies of insurance, one on his account, the other on account of the owners, naming the underwriter. The ship was lost, a_nd the defendants then produced a different policy, with another underwriter, and only insuring the ship, in which the plaintiff had no interest. The plaintiff, therefore, brought an action of trover, for the policy described in uhe letter. In defence it was said, as it is here, that trover could not be maintained for that which never existed. But Lord Mansfield, before whom the case was tried, “ would not suffer the defendants to contradict their own representation,” *tnd the plaintiff recovered. As this case cannot be distinguished from that before us, and as I think it clearly right, I do not hesitate to follow it.
.The difficulty suggested in regard to proving the value of property which has had no existence, is more imaginary than real. The same difficulty would exist in an action to recover for the fraud. The plaintiff in such an action could recover no more than the value of the grain. As the quantity was specified in the receipts, it was his own folly if he advanced more than its value. The market price of ordinary merchantable wheat, &c., would be the criterion of value and the measure of damages.
It is not necessary to notice the other technical points raised upon the argument. The order for a new trial should be ¡reversed, and final judgment should be rendered for the plaintiff upon the verdict.